**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUANITA D. PEREZ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 CV 03153 |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Juanita Perez, seeks judicial review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2); 1382c. Ms. Perez asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**
**PROCEDURAL HISTORY**

On December 10, 2007, Ms. Perez applied for DIB and SSI alleging that she had been disabled since March 9, 2007. (Administrative Record ("R.") 143)[1]. Her application was denied initially on March 6, 2008, and upon reconsideration on August 18, 2008. An Administrative Law Judge ("ALJ") convened a hearing on November 12, 2009, at which Ms. Perez, represented

---

[1] The entire Administrative Record is just shy of one thousand pages long; the medical record alone is over seven hundred pages. The length of this opinion is an unfortunate consequence.

by counsel, appeared and testified. In addition, Grace Gianforte, an impartial vocational expert ("VE"), also testified. On December 4, 2009, the ALJ issued a decision finding that Ms. Perez was not disabled.

This became the final decision of the Commissioner when the Appeals Council denied Ms. Perez's request for review on March 8, 2011 (R. 3). On May 11, 2011, Ms. Perez appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).


## II.
## EVIDENCE OF RECORD

Ms. Perez was born on November 14, 1956, making her fifty-years old on her alleged onset date and fifty-three years old at the time of the ALJ's decision (R. 143). At the time of her administrative hearing, she was approximately 5'1" and 236 pounds (R. 34). Ms. Perez is married with an adult son (R. 143, 33). She also has a daughter, who, according to multiple treatment notes, is one of the primary sources of her unhappiness. (See R. 273-74, 953-977). At the time of her application for SSI, her husband was gainfully employed with METRA making approximately six thousand dollars a month. (R. 145).


## A.
## Vocational Evidence

Ms. Perez has an eleventh-grade education, and acquired her GED in June 2006. (R. 35, 227). From 1994 to 1995 Ms. Perez worked for 3HP Investments, Inc., in an unknown capacity (R. 157-158). From 1996 until 2004 she worked for Parko Foods, LLC., in various capacities

2

primarily as a lead label maker. (R. 68-69, 155-157, 211). Starting in late 2004, she worked as patient services representative for Pronger-Smith, *Id.*, until she was fired from that position in March, 2007 because, "[t]he team leader and I didn't get along, so she filled out a bad report on me." (R. 36). She has not worked since although she has been looking for work. (R.36).

## B.
## Medical Evidence

## 1.
## Mental Health

On January 2, 2007, Ms. Perez saw psychiatrist Dr. Jody Reed. Dr. Reed noted: sadness, tearfulness, crying, helplessness, hoplessness, eight-pound weight loss, no precipitants, no previous episodes, anxiety and worrying – constantly worries about everything, is "SOB", no panics, and difficulty with memory and attention. (R. 265). Her "current" medications were amitriptyline, Paxil, and Xanax. Ms. Perez denied taking other medication in the past. Dr. Reed diagnoses her with Major Depression, severe, recurrent. He differed an Axis II diagnosis and for Axis IV he listed interpersonal. He determined a Global Assessment of Functioning ("GAF") score of 45-50. Dr. Reed proposed the following treatment plan: discontinue amitriptyline and Paxil, prescribe Cymbalta, psychological and neurological testing, therapy with "Anna", and a follow up in two weeks.

Three days later, on January 5, 2007, Ms. Perez met with therapist Anna Schiff. (R. 977). She denied any history of depression, but admitted seeing a psychologist "a long time ago." She reported some problems at work related to a difficult co-worker. The resulting treatment plan called for weekly therapy sessions with Dr. Reed providing medication management. There are

no other treatment/progress notes from Dr. Reed's practice until over a year later in November 2008.

Dr. Reed completed a Psychiatric Report for DDS on July 23, 2008. (R. 272-75). Under General Observations, he noted: "Normal posture and gait. Normal hygiene and at times can have decreased psychomotor activity. Normal clothing." (R. 273). He noted, "Over the past few years, she has been having mood difficulties more related to interpersonal conflicts within her family. She has been in treatment and shown improvement." (R. 273). He wrote, "She is able to function without assistance," (R. 273), and she has a "[n]ormal level of interest in various activities", but she has a "[s]trained relationship with her husband and child, which seems to serve as a significant stressor, which worsens her mood." (R. 274).

Dr. Reed described her mood and affect as within normal limits, although , "at times she can become restricted and tearful." (R. 274). Her speech was normal, her thought process logical and sequential with no hallucinations of delusion, and her orientation was normal and intact. (R. 274). Her abstract thinking was normal with no concrete thinking, her ability to note similarities and differences was normal, and her judgment was good. (R. 275).

Less than a month after the above Psychiatric Report, on August 11, Dr. Reed submitted another report to DDS.( R. 673). It reiterates a diagnosis of major depression and indicates treatment with medication and individual psychotherapy with a "Marginal Response." *Id.* Also noted is "Significant impairment in mood energy, interest, hopelessness." *Id.* Nonetheless, Dr. Reed indicated Ms. Perez, should have the ability to understand, carry out, and remember instructions as well as respond appropriately to supervision, co-workers and customary work pressures. *Id.*

Just seven days layer, on August 18, 2008, Dr. Reed submitted a completed Mental Impairment Questionnaire. (R. 696-699). For the first time, in addition to depression, he diagnosed her as Dependent Personality Disorder and Avoidant Personality Disorder and assessed a GAF score of 50-55. *Id.* On the form Dr. Reed checked off a multitude of symptoms. He listed her medications (Seroquel, Lexapro, Cymbalta), and indicated they did not cause any side-effects that might impact her ability to work. *Id.* Despite characterizing her prognosis as "Guarded," he indicated her impairment has neither lasted nor could be expected to last at least twelve months. *Id.* He checked that her mental impairment would result in her absence from work more than three times a month. *Id.*

Dr. Reed opined Ms. Perez had no useful ability to do work related activities on a day-to-day basis in a competitive work setting, (R. 697), explaining, "Her diagnosis of Depression and Personality Disorder make her unable to function. Severe impairment in Mood, Cognition, Affect, and Sleep." (R. 699). He went on to indicate *extreme* difficulties in maintaining social functioning, *constant* deficiencies of concentration, persistence, and pace resulting in a failure to complete tasks in a timely manner, and *repeated* – three or more – episodes of deterioration or decompensation in work or work-like settings. (R. 699). However, despite these assessments of crippling and pervasive dysfunction, Dr. Reed indicated that she had no restriction of activities of daily living. *Id.*

Meanwhile, at the Agency's request, two Psychiatric Review Techniques were completed by consultative psychologists. (R. 513-525, 674- 686). Both psychologists concluded Ms. Perez suffered from an Affective Disorder, but that her impairment was not severe. (R. 513, 674). Both found she had only mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence, and pace. (R. 523, 684). Neither found any evidence of

any episodes of decompensation. Both also indicated there was no evidence that Ms. Perez's depression caused more than a minimal limitation of ability to do any basic work activity. (R. 524, 685).

Dr. Reed's treatment notes begin again on November 21, 2008, when Dr. Reed noted Ms. Perez continued to have conflicts with her daughter. (R. 965). A mental status exam/assessment ("MSE") was entirely normal. On February 2, 2009, Ms. Perez indicated trouble sleeping and low energy levels. She said her overall mood was bad. Her MSE, however, was within normal limits.

On March 16, 2009, Ms. Perez reported she was still having conflicts with her daughter. She was still having trouble sleeping and her energy level was low. Her MSE was unremarkable noting normal mood and attention. On March 30, 2009, Ms. Perez reported she was doing better and sleeping well. (R. 959.) Dr. Reed noted an improvement in appetite, attention and concentration. Her MSE was again within normal limits. On April 13, 2009, improvements in appetite, attention, and concentration were noted. Her MSE was still within normal limits.

On June, 15, 2009, Ms. Perez's appetite, attention, and concentration continued to improve. (R. 955). Her therapist note her condition was stable and that she reported having fewer conflicts with her daughter. Her MSE was normal. On July 11, 2009, Ms. Perez although still frustrated with her daughter, indicated she was doing well on meds, she was sleeping well – without nightmares, and was taking care of herself including, going to the gym. Her mood was noted as sad, but her MSE was otherwise unremarkable. On July 17, 2009 Ms. Perez was still upset with her daughter. (R. 973). She also reported having nightmares. Her mood was depressed, but the rest of her MSE was normal. On July 30, 2009, her MSE was normal but for her depressed mood (R. 974).

On August 13, 2009, Ms. Perez reported she and her daughter were speaking again. (R. 975). Although tired, she was feeling better physically and her diabetes was under control. She still felt sad occasionally. She indicated she no longer needed Lunesta to help her sleep. A MSE was completely unremarkable. On August 20, 2009, Dr. Reed noted she was doing well. (R. 976). She was still sleeping well and not taking Lunesta, despite occasional nightmares surrounding her past abuse. Her mood was depressed, but her MSE otherwise normal. On August 25, 2009, Ms. Perez reported she was continuing to have difficulties with her daughter. (R. 971). She stated she was feeling "good" and denied health problems and reported doing well on her meds and sleeping well. She described the previous week with her husband as a good week overall. Her MSE indicated a sad mood, but all other assessments were normal.

On September 1, 2009, Ms. Perez's MSE was normal and it was noted she was doing well. (R. 969) She indicated she felt she was making progress in therapy and "starting to heal." She also reported her relationship with her daughter was improving. She said she felt fine physically although her blood sugar was high. On September 8, 2009, although sad, her MSE was normal. (R. 967). Again, it was noted she was doing well. She reported she was sleeping well and denied any issues. Her relationship with her daughter was still improving and she related she was content with the way things currently were. She was given homework to continue to identify her strengths and the positives in her life, and to start affirming that she is worthy and strong.

**2.**
**Physical Health**

The bulk of medical documents come from Pronger-Smith Medical Care, where Ms. Perez used to work. Most of these records omit the list of Ms. Perez's medications, vitamins and

supplements, referring the reader to an unattached "med list" or chart. Her list of medications, when listed, is extensive. (*See, e.g.,* R. 978). Overall, these records consistently note Ms. Perez's longstanding diagnoses of diabetes, anemia, and hypertension. They frequently note a history of diabetic complications of kidney disease, retinopathy, autonomic neuropathy, and albuminuria and occasionally indicate reports of depression.

On August 8, 2006, Ms. Perez was complaining of pain in both her knees. (R. 590). She reported her pain in the left a 9/10 and in her right a 4/10. Dr. Dolitsky's physical examination revealed *minimal* synovitas of the left knee but with full range of motion in both. He noted both knees showed tenderness, which was worse on the left. X-rays taken showed a "possible minimal joint space narrowing medially on both sides, but as stated only minimal." *Id.* Dr. Dolitsky, indicated he explained to Ms. Perez the *possibility* of mild degenerative joint disease versus a medial meniscus tear, but that he would have to either do a arthroscopy or MRI to confirm a diagnosis. He offered her the option of an injection of Depo-Medrol, which she opted for left knee only as she did not mind the pain in her right. *Id.* A subsequent treatment note from August 29 indicates her left knee pain was a 0/10, her right a 6/10. (R. 587).

On August 14, 2006, Ms. Perez was seen by Dr. Mayer following a syncope/presyncope episode in April of uncertain etiology –notes from St. Francis suggested low blood sugar. (R. 594). A physical exam was unremarkable, noting her muscle strength and tone were normal in all extremities as was her reflexes, and gait. *Id.*

On January 2007, Ms. Perez had no new complaints and reported an improved energy level and feeling good in general. (R. 457). During a follow-up at Southwest Nephrology, for her kidney disease in February 2007, Ms. Perez indicated she felt well and had no complaints. (R. 403, 449).

8

On May 1, 2007, at the Hematology Clinic, a review of systems was normal, except under psych, where depression was noted. (R 455). However, it was noted her depression was improving on meds and that she was seeing a psychologist. *Id.* On May 4, 2007, Ms. Perez was asymptomatic, and a physical exam was unremarkable (R. 445). On May 14, 2007 Ms. Perez stated she was doing "very, very well" and a review of systems was otherwise unremarkable noting, no complaints of chest pain, shortness of breath, or palpitations (R. 437). Dr. Manglano found her to be "completely asymptomatic." *Id.* On May, 15, 2007, her diabetes was noted as being still uncontrolled, but better. (R. 451).

On July 27, 2007, Ms. Perez was hospitalized at St. Francis following a near syncope event, secondary to anemia, while on a treadmill at cardiac rehab. An ECG revealed a normal sinus rhythm. (R. 367). She was given IV fluids for dehydration and discharged in stable condition the following day and advised to follow a diabetic diet and perform activity as tolerated. (R. 367). A follow-up at Pronger-Smith a few days later was unremarkable. (R. 443-44).

On August 7, 2007, during another follow-up at Southwest Nephrology for stage 3 kidney disease, Ms. Perez presented essentially asymptomatic and stated she had been feeling well, (R. 399). Her kidney disease was stable and she was recommended a low potassium diet. (R. 400). Later that month it was noted that her diabetes, although still uncontrolled, was better; she was exercising 4 to 5 times a week and following a good diet. (R. 432). An October 2007 examination was unremarkable. (R. 430).

On November 5, 2007, Ms. Perez was admitted to St. Francis Hospital complaining of severe – 10 out of 10 – chest pain. (R. 322-365). A venous duplex study showed no evidence of deep venous thrombosis. (R. 344). Several ECGs, a chest CT and chest X-ray yielded

unremarkable results. (R. 345-354). A physical examination indicated her hand strength and leg strength were normal. (R. 323). She was preliminarily diagnosed with atypical chest pain. (R. 359, 362-363).

On November 21, 2007, Ms. Perez was admitted to St. Francis Hospital for acute renal insufficiency with chronic renal disease secondary to diabetes, hypertension, and anemia. (R. 282-321). Once again, a venous duplex study showed no evidence of deep venous thrombosis or insufficiency. (R. 316). An X-Ray Bone Survey showed some unspecified degenerative changes in her spine and joints, (R. 317). A physical examination noted no pedal edema and a normal gait. (R. 291). An ultrasound of her kidneys revealed no significant abnormalities. (R. 319). Ms. Perez was given IV fluids and antibiotics for her leukocytosis, and kept for observation until her kidney function returned to baseline levels. She was then discharged as stable on November 24, 2007 with instructions to follow a low fat, low cholesterol diet and was permitted activity as tolerated. (R. 283).

During Ms. Perez's December 7, 2007 visit, her uncontrolled diabetes, hypertension, and anemia were noted, however, a physical examination was unremarkable. (R. 421, 422). She reported she felt much better. (R. 421).

On February 7, 2008, at the Agency's request, Dr. Patil conducted a consultative examination of Ms. Perez. (R. 500- 504). His diagnostic impressions were diabetes mellitus, chronic renal disease – stage 3, mild diabetic retinopathy, extreme obesity, and hypertension, with a history of dyslipidemia, anemia, depression and anxiety. (R. 503). Ms. Perez was on time for the evaluation and had driven herself. (R. 500). She claimed she was compliant with a 1500 calorie diet and regularly exercised at the gym. *Id.* But she also reported that she gets short-winded walking more than two blocks or going up and down the stairs. Ms. Perez complained of

polyuria, fatigue, and polydipsia. *Id.* She had no complaints of blurry vision, dysuria, chronic infection, diarrhea, or vomiting. She denied having any chest pain, dyspnea at rest, headaches, gait imbalances, or dizziness. *Id.* Ms. Perez also denied any other medical ailments. *Id.*

Dr. Patil noted she was hospitalized in November 2006 for chest pain and uncontrolled hyperglycemia, but that the cardiac work up was negative and there is not history of heart attack or stroke. Dr. Patil noted past surgeries, involving her cervical spine in 2000, and bilateral trigger fingers in 2002/2003. (R. 501). He noted she was obese. Her speech and gait were normal. An examination of her skin, head, ears, nose, mouth, and throat, neck, chest and lungs, heart, and abdomen were all unremarkable. (R. 501). An examination of her eyes indicated mild bilateral non-proliferative diabetic retinopathy with no external evidence of recent trauma. (R. 501). Her far vision with correction, in both eyes, was 20/25.

A mental status examination was unremarkable; her attention and concentration were fair, she was alert and her mood relaxed. (R. 502). With respect to her history of depression, Dr. Patil noted her mentation was normal, she was seeing a psychiatrist for medication and a psychologist for therapy, and that she reported her medications help to some extent. (R. 504). He also noted that Ms. Perez had *no* history of past inpatient psychiatric care. *Id.*

A visual inspection of her spine and back showed no obvious deformities of the spine. (R. 502). Nor was there any paravertebral tenderness or spasm and her neck and shoulders were normal. Dr. Patil observed minor limitations in her lumbar spine range of motion. *Id.* Ms. Perez was neurologically intact, as her reflexes were brisk and equal bilaterally, cerebral function tests were normal, superficial and deep sensations were unimpaired, and all cranial nerve functions were preserved. *Id.* Furthermore, she had a motor strength of 5/5 in both upper and lower extremities and there was no sign of muscle wasting or paralysis. *Id.* With respect to her

extremities and musculoskeletal system, a full range of motion in her joints was noted. Ms. Perez had *no* difficulty performing all fine and gross manipulative movements with her hands and fingers, with a grip strength in both hands of 5/5. (R. 503). Her gait was normal, she walked without an aiding device, and no abnormalities were observed in her ability to squat and arise, stand up, or heel to toe walk. *Id.* He concluded his examination asking her if he had addressed all of her medical complaints, to which she responded affirmatively. *Id.*

Also at the request of the Agency, Dr. Wabner completed a Physical Residual Functional Capacity Assessment on February 26, 2008. Dr. Wabner assessed that Ms. Perez was capable of performing a full range of light work with no additional limitations. (R. 506-09). Dr. Wabner noted Ms. Perez's allegations of diabetes, kidney problems, heart palpitations, depression, HPB, anxiety, high cholesterol, and anemia. (R. 512). He relied on Dr. Patil's observations including minor limitations in range of motion in her lumbar spine, her full range of motion in her joints, her motor strength of 5/5, her bilateral ability to perform fine and gross manipulation, and her normal gait. (R. 512).

On March 10, 2008, Ms. Perez visited Pronger-Smith with a bruised right shin. (R. 537-538, 583). There is a notation relating to her left leg, but it is indecipherable. Other than her bruise, a physical examination was unremarkable. A follow-up for her diabetes on March 31, 2008, was alsounremarkable. (R. 539-540, 575).

On March 18, 2008, Ms. Perez was seen by Dr. Fahey at Pronger-Smith, he noted her poorly controlled diabetes and her primary complaint of several recent falls. She reported two recent falls, one in February, the other on March 12, 2008, when she fell face first, chipping two front teeth. (R. 546). She claimed in both instances, she was walking when her left leg "suddenly buckled". *Id.* She also reported that her left leg has been getting weaker over the course of the

previous 3 months and that she has developed neck pain and numbness and tingling over most of her left leg. *Id.* She denied any symptoms on her right side or any shooting or proximal pain in her left leg. *Id.* She claimed she had falls resulting from left leg weakness in 2000 before her operation for a herniated cervical disk and that her symptoms then where qualitatively identical to what she was currently experiencing. *Id.* She related that she had syncopal spells in the past related to autonomic insufficiency from her diabetes, but that these falls were different as she never felt dizzy or lost consciousness. *Id.* Dr. Fahey indicated that other than her claimed leg weakness, her review of systems was unremarkable. (R. 547). Despite her allegations, Dr. Fahey physical examination revealed very mild limitations in her left leg motor abilities and minor deficits in sensation. *Id.* He noted she was currently using a cane, and recommended she continue using it. He indicated she had no pain that would suggest diabetic amyotrophy and no obvious wasting on her left side. *Id.* He ordered a nerve conduction study of her lower left extremity and an MRI of her cervical spine. *Id.*

On March 31, 2008, there is a record from Pronger-Smith that indicates someone reviewed Ms. Perez's MRI with her. (R. 585). On April 9, 2008, Ms. Perez reported multiple falls, and back and neck pain. (R. 535). It was noted her blood sugar was better and a physical examination was unremarkable. *Id.*

On April 10, 2008, an EMG was performed on Ms. Perez's lower left extremity. (R. 545). Dr. Mayer's clinical impression was "[e]ssentially normal electromyography/nerve conduction study of the left lower extremity. There was no electro physiological evidence for a polyneuropathy or myopathy affecting this extremity."

On May 9, 2008, Ms. Perez reported episodic gate instability associated with falling, but Dr. Mayer noted she exhibited no clear neurological abnormalities during her physical

13

examination and her gait was normal. (R. 568). Dr. Mayer noted her recent EMG/NCV of her left leg was completely normal. Similarly, an MRI of her cervical spine showed a post cervical spine fusion at C6/C7 and a herniated disk at C7/T1, but did not show any clear cord abnormalities. *Id.* Because both the EMG and MRI were "normal" Dr. Mayer did not feel any further neurological workup was needed. (R. 568). He noted that Ms. Perez "seems to imply her left knee gives out periodically" so he recommended she wear a knee brace and starting in June begin exercising with it. (R. 568-69). Dr. Mayer did comment that she was on a "very long list of medications."Ó (R. 568).

During a May 14, 2008 follow-up for her anemia, Ms. Perez reported no complaints, and denied fatigue or shortness of breath. (R. 541). A physical exam was unremarkable: under neck, it was noted, "no masses, pain, stiffness, or LAD;" with respect to musculoskeletal, "no pain, weakness, or functional disability;" under neurological, "no numbness, tingling, dizziness, or dyscoordination;" and for psychiatric, "no depression, anxiety, insomnia, dementia, or SI/HI." (R. 542). Similarly, in a second report from the same visit, the doctor noted, "[n]ormal gait and balance, symmetrical muscle strength, mass or tone. Full active range of motion or extremities, no instability or joint swelling." (R. 543). The treating physician did note that Ms. Perez reported 2 falls in the past, but none recently, and that she should continue following up with Neurology. *Id.*

On May 20, 2008, Ms. Perez returned to Pronger-Smith, after a fall. (R. 534, 579). She reported her left leg gave out, and she complained of injury, to her left shoulder and ribs. (R. 534). On May 21, she was referred to Dr. Markus who diagnosed her with a low-grade acromioclavicular separation of her left shoulder and left rib contusions. (R. 589). He noted a CT scan of her brain and cervical spine showed no acute pathology and a chest and lumbar spine x-

rays were normal. *Id.* He took X-rays of her shoulder, which were unremarkable, and prescribed her Vicodin for pain. *Id.*

Ms. Perez returned on June 12, 2008, reporting her pain had subsided considerably, but that she still had some discomfort in her left anterior chest and difficulty raising her left shoulder. (R. 588). Dr. Markus noted limited range of motion in her left shoulder, but that she had no tenderness in her neck or midback. *Id.* She indicated she was still sore in her rib region. *Id.* Dr. Markus ordered an MRI of her shoulder to make sure her injury was not anything more serious than a simple low grade separation as he original suspected. *Id.* A record from follow-up for MRI/labs on June 25, 2008, although largely indecipherable, contains notations of left knee buckling, no pain, high blood sugar, and increased creatinine. (R. 577-578). Although the review of symptoms has check marks indicating negative findings, the concurrent physical examination is entirely normal. (R. 578).

Referred by Dr. Markus, on June 30, 2008, Ms. Perez began physical therapy for her injured shoulder. (R. 931). At Physical Therapy and Sports Injury Rehabilitation ("PTSIR") she related that in April, she was on a step-stool at her hope when she *slipped and fell*, landing on her left shoulder and hitting her head. Her main complaint was pain. The therapist noted she displayed shoulder biomechanical faults consistent with shoulder anterior glide syndrome, and opined that she was "an excellent candidate for physical therapy." *Id.* A treatment plan lasting four weeks was indicated.

A general follow-up on July 7, 2008, yielded no remarkable findings. (R. 570). During a follow-up for anemia on July 14, 2008, Ms. Perez reported no complaints other than mild fatigue associated with anemia, and intermittent nausea. (R. 563). Her current medication list was extensive covering approximately a page. She reported no pain or stiffness in her neck, no pain,

15

weakness, or functional disability in in her musculoskeletal system, and no numbness, tingling, dizziness, or dyscoordination. (R. 565). The treating physician noted normal gait and balance, symmetrical muscle strength, mass and tone. She also noted full active range of motion in Ms. Perez's extremities with no instability or joint swelling. *Id.* The treating physician indicated Ms. Perez reported a fall in the past month but denied any dizziness. *Id.*

On July 31, 2008, Ms. Perez reported having increasing pain and stiffness in her left shoulder. (R. 829). Dr. Markus diagnosed a frozen shoulder and recommended manipulation under general anesthesia with a cortisone injection. *Id.* On August 5, 2008, after falling out of her bed and hitting her nightstand, Ms. Perez complained of pain in her upper chest and right shoulder. (R, 804). An X-ray revealed no signs of acute trauma and minimal degenerative changes at the aromioclavicular joint; the radiologist noted there were no significant changes compared to an X-ray from January 31, 2006. *Id.*

On August 14, 2008, at the Agency's request, Dr. Pilapil completed a second Physical Residual Functional Capacity Assessment with updated records from Pronger-Smith. Like the February 2008 assessment, *see supra*, Dr. Pilapil, assessed that Ms. Perez was capable of performing a full range of light work. (R. 688-695). Due to her obesity, hypertension, and some decrease in lumbar range of motion, he limited her to occasionally lifting/carrying nor more than 20 pounds, frequently lifting/carrying no more than 10 pounds, standing/walking for a total of about 6 hours in an 8-hour workday, sitting for a total of six hours in an 8-hour workday, with no limits in her ability to push/pull. (R. 689). He found no postural, manipulative, or communicative limitations. (R. 690-92). Noting Ms. Perez's history of non-proliferative diabetic retinopathy, and that a recent vision test revealed her pupils were equal and reactive to light, her visual acuity was 20/25, and that she had no complaints of blurry vision he concluded she did not have any

16

visual limitations. (R. 691, 693). Given her history of shortness of breath he indicated she should avoid concentrated exposure to fumes, odors, gases, poor ventilation, etc. (R. 692).

Following her left shoulder manipulation by Dr. Markus on August 27, 2008, Ms. Perez was again referred to physical therapy. On September 4, 2008, at PTSIR she reported that she felt significantly better since the manipulation, but still had some tenderness and discomfort in that area. (R. 938). On October 1, 2008, the physical therapist indicated she had met all goals – including an increase in range of motion and strength as well as a reduction in pain and tenderness – and was recommending her discharge from therapy. (R. 937).

Also on October 1, 2008, Dr. Dholakia noted that since her shoulder manipulation, Ms. Perez had been doing great with "that." (R. 801). Her range of motion was better and he noted she could "do a lot of things she could not do before." *Id.* With respect to her diabetes, he indicated her pre-lunch and pre-supper sugars were high and he would adjust her medication. He also noted a complaint of heel tenderness, but her physical exam was otherwise unremarkable.

On October 7, 2008, Ms. Perez saw Dr. Markus for a follow up after her shoulder manipulation. (R. 800). She reported her left shoulder had, "no pain whatsoever." *Id.* She complained of heel tenderness and, having been treated for heel spurs in the past, requested an injection. Dr. Markus gave her a Depo-Medrol injection in both heels.

An October 22, 2008 follow up with Dr. Bolisay was unremarkable. (R. 798). On November 11, 2008, Ms. Perez met with nurse Arenas to discuss carbohydrate counting. (R. 794). It was also noted that she would be starting to use an insulin pump. She and the nurse discussed her diet and exercise. Ms. Perez indicated that her activity had been limited due to a fall, but that she had started a new exercise routine where she used a treadmill or bike for 15 to 20 minuets and then weight machines for 20-30 minutes, 2 to 3 times a week. *Id.*

17

On November, 18, 2008, Ms. Perez reported visiting the emergency room over the weekend complaining of nausea, vomiting, and diarrhea. (R. 796). She was treated with fluids and medication and felt better. She also complained of headaches with some neck discomfort. Dr. Dholakia indicating cervical disk disease, prescribed her a muscle relaxant, and recommended using a heating pad, wearing a collar, and physical therapy. (R. 797).

On December 2, 2008, complaining of neck pain, Dr. Markus noted during his physical exam, that Ms. Perez had no localized tenderness and her upper extremity deep tendon reflexes were entirely normal and symmetrical. (R. 793). A radiograph showed her surgical fusion at C6-C7 and some degenerative changes at C5-C6. He referred Ms. Perez to physical therapy.

On December 18, 2008, Ms. Perez returned to PTSIR for physical therapy to treat disc disease of the cervical spine resulting in headaches. (R. 934). The therapist noted she displayed signs and symptoms consistent with a movement impairment of extension rotation syndrome of the cervical spine. Ms. Perez, complaining of headaches, denied any numbness or tingling into her upper extremities. She stated she had been wearing a neck brace, which gave her significant improvements with her headaches. She rated her pain as a 9/10 at its worst, and scored a 55% disability index based on a questionnaire. She claimed she could no longer perform household activities or read when she was having a headache, but that she had no prior limitations with activities of daily living. Despite her complaints, her physical therapist noted her strength was 5/5 bilaterally in her upper extremities and her sensation was intact x4. Although a minor anomaly was noted with respect to her C5-C6 and C7 reflexes, her reflexes were bilaterally equal and symmetrical. Her grip strength in her left hand was 18 pounds, and 22 pounds in her right. She was tender in her upper back and through C4-C5, but a positive distraction test to her cervical spine relieved her pain in all motions. *Id.*

18

About a week later, on December 26, 2008, Ms. Perez showed improvement. (R. 933). With respect to her cervical range of motion, her flexion went from 15 degrees to 31; her extension 20 degrees with pain to 40 degrees without pain; her side bending left 24 with pain to 26 with no pain; and her rotation right from 58 degrees with pain to 55 with no pain. Her pain rating went down to a 6 or 7 at its worst. She evidenced less tenderness in her upper back and indicated she no longer had any tenderness over the C4-C5 spinous processes. Her disability index improved to 45% and the frequency of her headaches decreased to 2 to 3 times per week. Her therapist wrote Dr. Dholakia a letter indicaing Ms. Perez was making good progress, but that she was being discharged from physical therapy until she resolved her other medical issues. (R. 928).

On December 16, 2008, Ms. Perez had returned to Pronger-Smith for training on how to use an insulin pump. (R. 791). It was noted she reported being hospitalized the week before for excessive vomiting. She also reported her exercise routine consisted of 50 minutes of cardio and 30 minutes of weights 3 to 4 times a week. *Id.* During a follow-up with Dr. Dholakia on December 29, 2009, he noted she still had issues with blood sugar levels and he recommended insulin in the morning and evening and exercise  (R. 789-90). A physical exam was utterly unremarkable.

On January 13, 2009, Ms. Perez canceled her appointment to begin using her insulin pump. (R. 785). On the 20th she was hospitalized for uncontrolled sugar (R. 783-784). On the 28th she saw Dr. Dholakia for her blood sugar issues. She complained of some neck pain – "electrical shock type pain" – and discomfort. (R. 782). A physical exam, including neurological function, was however, normal. *Id.*

19

On January 27, 2009, an MRI revealed cervical fusion from surgery at C6-7 resulting in a large central disc bulge/protrusion at C7-T1 with some spinal stenosis. (R. 778-79, 898-900). Additionally, mild/small disc bulges at C5-6 and C4-5 with some evidence of spinal stenosis were noted. However no spinal cord lesions were demonstrated. Furthermore, it was noted the appearance of the cervical spine was similar to a previous CT examination on May 17, 2008. (R. 900).

During a follow up on February 9, 2009, Ms. Perez complained of both hyper and hypoglycemia. (R. 776). Dr. Bolisay indicated she did not have any blurred vision, polydipsia, or polyuria. *Id.*

In February 2009, her physical therapist noted Ms. Perez presented consistent with a diagnosis of cervical extension syndrome. She claimed her pain was an 8 or 9 out of 10. However, the therapist noted no abnormal neurological signs, and her reflexes were bilaterally intact in her upper extremities. Less than a month later, on March 2, 2009, Ms. Perez showed objective and subjective improvement from physical therapy. (R. 929). Although she continued to complain of clicking in her neck and still had some pain with neck extension, her cervical range of motion had improved significantly. Similarly, she self-assessed a lower pain grade.

On March 1, 2009, Dr. Dholakia completed a Diabetes Mellitus Residual Functional Capacity Questionnaire for the Agency. (R.703 - 706). He noted Ms. Perez suffered from insulin dependent diabetes, hypertension, lability, syncope, and – presumably, as he listed it under "Prognosis" – degenerative joints. All of which contributed to –as indicated by check-boxes – symptoms of fatigue, episodic vision blurriness, general malaise, muscle weakness, psychological problems, frequency of urination, dizziness/loss of balance, hyper/hypoglycemic

attack.[2] (R. 703). He indicated Ms. Perez could only walk half a block without rest, sit for 15 minutes before needing to stand, and stand for 10 minutes before needing to sit or move. (R. 704). In an 8-hour working day, he opined she could sit for a total of less than two hours and she could stand/walk for a total of less than two hours. *Id.* He also checked that she would need a job that permitted shifting positions at will and would need to take frequent unscheduled breaks throughout the workday. *Id.* Despite her unspecified difficulties walking or standing, he did not indicate a need for a cane or other assistive device. (R. 705). Dr. Dholakia continued, checking that she could *never* lift/carry 10 or more pounds, and she could only occasionally lift/carry *less* than 10 pounds. (R. 705). However, he indicated she did not have any significant limitations reaching, handling, or fingering. *Id.* Finally, he noted she would have good and bad days resulting in her being absent from work more than four days per month. *Id.*

On March 2, 2009, Ms. Perez saw Dr. Dholakia complaining of numbness in her left arm, and tenderness on her neck and lower back/lumbar area. (R. 772). He noted she was using a cane. His physical examination revealed she had cervical pain with significant restricted range of motion and although her higher function and cranial nerves were normal, her hand strength, reflexes, and strength were slightly weaker on the left side. *Id.* An X-ray of her lumbar spine was relatively unremarkable revealing degenerative changes of the lumbar spine with slight narrowing – "very mild disc space narrowing is suggested" – at L3-4. (R. 770). Noting how successful physical therapy had been in the past, Dr. Dholakia indicated she was to continue with therapy. (R. 772). He opined if her cervical disk issues did not improver, she would need surgery. (R. 773).

---

[2] Surprisingly, given Ms. Perez's allegations, he did not check the corresponding box for "retinopathy" or "kidney problems," (R. 703), both of which are consistently noted diagnoses. (*See e.g.,* R. 743). Nor, he did not check "extremity pain and numbness," "loss of manual dexterity," or "difficulty thinking/concentrating." (R. 703).

On March 18, 2009, Ms. Perez's diabetes was still uncontrolled, but Dr. Dholkia believed that an insulin pump would resolve those issues. (R. 768-69). She still complained of neck pain and numbness, however except for her upper extremity being slightly weaker on her right side her higher functions, cranial nerves, hand and leg strength, and gait were all normal. Dr. Dholkia indicated that physical therapy was not helping and that she would probably need to see a neurosurgeon to see if she was a candidate for surgery. Ms. Perez reported having some difficulty swallowing and Dr. Dholakia referred her for a barium swallow study. The study, on April 1, 2009, was "unremarkable," (R. 758).

On March 19, 2009, Ms. Perez returned to PTSR for physical therapy. (R. 893). On April 3, 2009, a report from PTSIR, indicated objective improvement in both her lumbar and cervical range of motion, without pain. (R. 837). The record also indicates less tenderness in her lower back, but continued tenderness in her upper back/shoulder and neck.

On March 20, 2009, Ms. Perez finally began using an insulin pump. (R. 764-66).

On April 6, 2009, Ms. Perez presented with an upper respiratory infection. Dr. Dholakia noted she had just had trigger finger release surgery with Dr. Mejia for multiple fingers. He also noted, no headache, dizziness, vision problem, or tingling or numbness of the hand. (R. 757). Her gait was normal. Her hand strength and leg strength were normal, but she had limited sensation in her hands and her reflexes were diminished; she was wearing a cervical collar. Dr. Dholakia repeated his recommendation that she see a neurosurgeon for her neck.[3]

On April 21, 2009, Ms. Perez met with Nurse Arenas. (R. 751). Despite being told to monitor her blood glucose before a meal, Ms. Perez was waiting 2-3 hours after a meal before

---

[3] There do not appear to be any records from a neurosurgeon regarding her cervical disk complaints in the record.

checking. Similarly, she was not properly tracking her carbohydrates consumption. The result of her non-compliance, the nurse explained, was that she was not getting the proper amount of insulin from her pump at the proper time. The nurse reiterated the importance of keeping a food journal, which she had failed to do.

On April 27, 2009, Ms. Perez saw Dr. Dolitsky complaining of clicking and locking of her right ring finger. (R. 748). She indicated she previously had *successful* surgery for the same issue with different fingers ("her third finger on both sides"), and elected to have the surgery again. *Id.* Around May 14, she underwent trigger finer release surgery. Her final postop check was on June 18, 2009 during which Dr. Dolitsky noted she had full range of motion in the finger and no complaints. (R. 732). Since the surgery however, she was now having a similar issue with clicking and pain in her right thumb. Rather than surgery, Dr. Dolitsky recommended and administered an injection of Depo-Medrol into the tendon sheath at the MCP joint. He indicated if it worked, she need not follow up; there are no other reports in the medical record that relate to her right thumb.

Ms. Perez's May, 5, 2009 follow-up with Dr. Dhokalia was unremarkable; her physical exam entirely *normal*. (R. 743). On May 27, 2009 she followed up with Dr. Bolisay for her diabteus where she indicated her blood sugar was higher due to a lot of stress. (R. 738). On June 24, 2009, the data from her insulin pump was uploaded revealing she still was not compliant with treatment, as she wasn't blousing with all her meals. (R. 728).

On July 10, 2009, Ms. Perez complained of pain with movement in her right midrib area. (R. 726). A series of X-rays revealed clear lungs, mild aortic tortuosity, degenerative changes of the thoracic spine, but no clear evidence of right rib lesion. (R. 724). Dr. Dhokalia described these X-rays as "normal," and simply advised her to take an anti-inflammatory (R. 727). He

noted her diabetes was doing "fairly good" and a review of systems was otherwise unremarkable. *Id.* A neurological exam was within normal limits. (R. 727).

On July 20, 2009, during a follow-up with Dr. Dholkia she presented with elevated creatine and potassium levels. (R. 717) She was sent to the ER to get her potassium under control and she was released that night. *Id.* The next day, she related to Dr. Dholkia she was unable to lose weight despite her exercise program. A review of systems was other wise unremarkable, and again a neurological exam was within normal limits. (R. 717-718).

Ms. Perez followed up with Dr. Dholkia on August 12, 2009 complaining of increased fatigue. Dr. Dholkia's treatment notes from this meeting, although typed, at times make no syntaxical sense (e.g., "Patient is also going to sleep in his diet feeling good she was in the 80's obtained the right side lower ribs"). (R. 714). That said, he indicated that Ms. Perez did not have any headaches or visual changes. She had no pain or stiffness in her neck. She had no musculoskeletal pain, weakness, or functional disability. She had no complaints of numbness, tingling, dizziness, or dyscoordination. Nor did she have complains of depression, anxiety, or insomnia.

Ms. Perez's physical exam was equally positive. (R. 715). Her eyes were reacting properly and her conjunctiva was normal. No shortness of breath. Her neck was supple. Her cranial nerves were intact and her reflexes symmetric bilaterally with no gross neural deficits apparent. She had no swelling in her extremities and normal peripheral pulses. She exhibited normal range of motion with a normal gait and balance with no focal weakness, or joint swelling. She was alert and oriented, her affect appropriated and she did not appear to be depressed or anxious. She displayed good muscle tone in her back with no scoliosis or tenderness. Dr. Dholakia then wrote, "Right-sided lower rib tender leg swollen 1+ neck pain or

24

signs tingling numbness both hands." *Id.* While those are all previous complaints by Ms. Perez, it is unclear from that sentence whether those complaints have been resolved, although the lengthy recitation of unremarkable physical findings certainly supports such a reading. Moreover, he continued, noting that Ms. Perez's cervical disk disease was "better with physical therapy no further treatment necessary." *Id.* He then indicated she need not follow up for at least three months.

Subsequent appointments scheduled for September 9, 2009 with Dr. Dholkia and Dr. Bolisay were canceled when Ms. Perez did not show. (R. 709-10).

## C.
## Administrative Hearing Testimony

At the beginning of the hearing, Ms. Perez's attorney did not object to the admission of any exhibits in the file and represented to the court when asked if she had anything else to produce at that time that the record was complete. (R. 32-33).

## 1.
## Plaintiff's Testimony

At the administrative hearing on November 12, 2009, Ms. Perez testified that, at the time of the hearing, she was married and lived with her husband and her thirty-two year old son. (R. 33). She was 5'1 and ½" and weighed 236 pounds. (R. 34). She had lost weight since she filed her application as a result of a 1200 calorie diet recommended by her doctor. (R. 34-35). Ms. Perez initially testified that she had not worked since 2006, but, upon further questioning by the ALJ, was reminded that she had not worked since March, 2007, when she was fired from her position in patient services at Pronger-Smith. (R. 35-36). She said she was fired because she and

the team leader didn't get along, and the team leader gave her a bad written report. (R. 36). She had worked there for approximately three years and described her job duties as sitting at the reception window and answering the phone and checking in patients. (R. 37). She testified that since being fired, she was attempting to find work as a receptionist and was filling out applications once or twice a week. (R. 36).

Prior to Pronger-Smith, Ms. Perez worked for Parco Foods, a cookie manufacturer, for twenty-seven years (R. 36-37). According to Ms. Perez's testimony, her position with Parko Foods was eliminated in 2000, so the company "got rid" of her. (R. 40).

Ms. Perez testified the main reason she was unable to work, was because of trouble with her leg. (R. 43). Specifically, she described her left leg as periodically, and without any warning, "disappearing," causing her to fall. (R. 43). She claimed that she's suffered five falls where she has sustained serious injury resulting in the loss of two front teeth, scraped legs, and a fractured left arm. (R. 43, 44). This started occurring sometime *after* she was fired from Pronger Smith, maybe a year later, and was continuing to occur as of the date of the hearing with increasing frequency. (R. 43-44). Ms. Perez believed the cause of her leg giving out was a "neurological phenomenon" testifying that unspecified doctors ascribed the phenomenon to another herniated disc in her neck requiring surgery. (R. 44). On the date of the hearing, the only treatment she was currently prescribed, was Vicodin, as needed, for the pain. (R. 45). The ALJ asked her if it was prescribed to take during the day. Ms. Perez indicated that it was but then testified that while it did help and she didn't suffer any negative side effects, she tried to only take it at night unless that pain was really bad. (R. 45). Having just testified that Vicodin did not cause her any bad effects, (R. 45), Ms. Perez, responding to questions by her attorney, clarified that she did not take it during the day, because it made her "very drowsy." (R. 61).

26

Ms. Perez testified that when she first started falling down, she had a complete physical and checkup and was given a leg brace, which she used for a year and a half. (R. 57). She claimed shortly after that, doctors tried to get her to use a walker but she didn't want one and instead, they gave her a cane. (R. 58). Ms. Perez indicted that she can stand for an hour using her cane, and uses it to move around her house. (R. 63).

Ms. Perez also indicated she was having a lot of neck pain – a sharp, stabbing pain – because of her disc problems. The pain travels down her spine and down her left arm. (R. 58). She has numbness in her left little finger and right ring finger, which she attributes to her neck problems. (R. 59). Additionally she has problems with her left hand because of a trigger finger. A doctor had given her a cortisone shot to treat it, which hadn't worked, and wanted to wait a few months before giving her another and considering surgery. (R. 59). Ms. Perez also claimed she was having difficulty with one of her arms – which one is unclear – and her ability to reach or lift objects. (R. 59-60).

Ms. Perez's attorney also solicited testimony about her retinopathy. When Ms. Perez sneezes hard or get's angry or really frustrated, the blood vessels in her eyes burst. (R. 60). They usually heal on their own, but sometimes require laser surgery to cauterize the blood vessel. However, until they heal, she has difficulty reading, the blood clots blocking several letters. Similarly, she misses stiches while crocheting. (R. 60). Additionally, even without popped blood vessels, Ms. Perez claims focusing with her eyes is painful, and fatigues her eyes. (R. 60-61). She indicated she had laser surgery within the last year, but admitted the procedure was not corrective, but to seal off a burst blood vessel. (R. 63).

Ms. Perez affirmed she had been hospitalized in 2000 for regional surgery on her disc. (R. 63). Two years prior to the hearing, she was hospitalized for kidney problems; she was in the

hospital more recently for her diabetes. (R. 64). When asked if she felt she was getting adequate treatment for those problems – diabetes and kidney disease – she responded "[y]es I am," and indicated she had been placed on an insulin pump. (R. 64). When questioned, she related she had been switched to a pump, because she had not been able to control her diabetes using pills or individual shots of insulin. (R. 64). Having been on the pump for about a year, she indicated that it "seems to be doing the work." (R. 64). She had been originally placed on injectable insulin when first diagnosed in 1980, but had stopped using it, until 2007, when doctors put her back on injectable insulin. (R. 65). Prior, to 2007, doctors had recommended she try controlling her diabetes with diet and exercise. She tried to exercise, even purchasing a treadmill, but due her leg, she "was lucky if [she] was on there five minutes." (R. 66). Since being on the insulin pump, Ms. Perez affirmed that her blood sugar is being properly regulated. (R. 67).

Ms. Perez testified that the other primary reason she wasn't able to work was because of depression and the resulting difficulty concentrating. (R. 45). Ms. Perez alleged that during the course of the day she will frequently, "space out" and forget what she was doing. (R. 48). According to her testimony, her depression became really bad starting in 2005. (R. 45). During that year, it was so bad she went to the hospital where she was seen by a psychiatrist. (R. 46). She has not been to the hospital for depression since.

At the time of the hearing, she was seeing a psychiatrist, Dr. Jody Reed, every month and a half, and had been under his care for a period of years. (R. 46). Ms. Perez also saw a psychologist, who was affiliated with Dr. Reed, weekly for individual therapy. (R. 46-47). Dr. Reed treated her depression with medication and had prescribed her Cymblata, Abilify, Lunesta (to help her sleep), and another medication she could not remember. (R. 46-47). She testified that the medications did help – "at times" – and that they did *not* cause her negative side effects.

28

When asked if there was anything else she felt made her unable to work, she said there there was not. (R. 48).

With respect to activities of daily living, Ms. Peres testified that wakes up at five in the morning. She makes her husband lunch and sends him off to work. Then she will sit around and crochet for 15-20 minutes until her hands start to hurt. (R. 49-50). She does household chores such as vacuuming the entire house –every other day – and dusting – regularly. She clarified that it was only the living room that had carpeting and was therefor the only room she vacuumed. (R. 50). At the prompting of her attorney, she testified that she has to take breaks while vacuuming because her leg will get fatigued and she gets tired; it's "a small house," but "it seems like a castle" when she's trying to clean it. (R. 61). While cleaning, she has to take a break every hour and a half for at least 15 to 20 minuets. (R. 62). Dusting aggravates her left arm, and her right, gets tired after a while. (R. 62).

Ms. Perez further testified she cooks maybe once or twice a week, although she used to cook everyday. She drives occasionally, by herself, to the bank and to doctor's appointments. (R. 51). She tries to go onto the computer at least once a day for 10 to 15 minutes primarily to search for a job; her son helps her fill out job applications on the internet. (R. 51, 52). Other than her crocheting, she enjoys reading Romance novels and can do so for approximately a half-hour depending on her eyes. (R. 52). She likes to go out socially for dinner for at most two hours, which occurs 5 days a weeks since she only cooks twice a week. (R. 52-53). She goes grocery shopping with her husband and son once every two months.

Ms. Perez related she likes to watch the TV procedural NCIS, which, as the ALJ pointed out, is an hour-long show. (R.54). Her attorney clarified through questioning, that although Ms. Perez enjoys NCIS, she has to tape it, because sometimes she's watching it, and "just doesn't

know what it is" she just saw and needs to rewind it and watch it again. (R.63). She stated she doesn't see too many friends ever since she started falling and being unable to "get up on [her] own." (R. 56). She indicated she gets along well with her son. She is not a member of a church or other social organization. (R. 57).

Ms. Perez testified she can only sit – "tops" – for half an hour and stand for an hour. (R. 53). She can walk "maybe" two blocks and lift at most 5 pounds. (R. 53). The ALJ noted she was using a cane at the hearing and wearing a neck brace – soft collar. Ms. Perez indicated she had been wearing the soft collar for about four months and that her internist "Dr. Dalakia" [phonetic] recommended she wear it. (R. 55). She claimed Dr. Dholakia had referred her to a neurosurgeon, but she was waiting for her "insurance to clear" before making an appointment.

In response to her attorney's questions, Ms. Perez indicated her pain – pain from what isn't clear – gets so severe that she has trouble focusing on what she is trying to do. (R. 62). For example, she testified that she'd start cleaning one room, and then forget what she was doing there, and start cleaning another room.

## 2.
## Vocational Expert Testimony

The Vocational Expert ("VE"), Ms. Gianforte, having reviewed Ms. Perez's work history, testified that Ms. Perez's past relevant work as a lead label maker involved multiple job responsibilities which lent themselves to multiple definitions within the Dictionary of Occupational Titles. ("DOT"). (R. 68). A lead label maker would be akin to the Department of Labor's identification of a "production clerk", which the under DOT 221.382-018 would be sedentary, SVP 4. Part of Ms. Perez's responsibilities however included being a "packaging

30

machine operator", 920.685-078, at the medium exertion level, SVP 2, and a "labeler", 920.687-126, at light, SVP 2. Her most recent position, working as a patient services rep for a medical clinic was classified by the VE as an "admissions clerk", 205.362-018, at sedentary, SVP 4. (R. 69). She explained that in her opinion, Ms. Perez performed that position at the light exertion level, however, the main job duties – answering the phone; checking in patients; checking insurance data, data of birth, name, addresses; making appointments, handling canceled appointments; taking copays, and balancing the cash drawer – were all sedentary activities. (R. 69).

The ALJ ask the VE to consider a hypothetical individual with a vocational background similar to Ms. Perez who was limited to light exertion, must avoid exposure to environmental irritants such as fumes, odors, dusts, and gases, and was limited to understanding, remembering, carrying out simple and detailed but not complex instructions. (R. 70). When asked whether such an individual could perform any of Ms. Perez's past relevant work, the replied nothing in that hypothetical would preclude work as a labeler, 920.687-126. (R. 70). The ALJ, then asked the VE to consider a hypothetical individual with all the previously stated limitations, but limited to sedentary, instead of light, exertion. (R. 70). The VE testified nothing in the hypothetical would suggest an individual could not do the work of an admissions clerk or production clerk. (R. 70-71). Finally, the ALJ asked the VE to assume an individual who could not engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a 40-hour work week or an equivalent schedule. The VE responded affirmatively to the ALJs question, whether full-time competitive work was precluded for such an individual at all evectional levels. (R. 71). The ALJ concluded his questioning, asking the whether her testimony was consistent with the descriptions in the DOT, to which the VE replied affirmatively. (R. 71).

Ms. Perez's attorney asked the VE what would happen if an individual were off task 20 percent. (R. 72). The VE – predictably – responded it would preclude the ability to sustain competitive work. (R. 72). Ms. Perez's attorney then asked if an individual needed additional unscheduled breaks, would that also preclude competitive work. (R. 72). The VE replied affirmatively. (R. 72). The attorney finished her questioning asking the VE whether an individual's required the use of a cane for standing and balancing would limit them to sedentary work, to which, the VE said, it would. (R. 72).

## D.
## ALJ's Decision

The ALJ's decision consists of thirteen pages and is meticulous in its analysis with frequent citations to the extensive medical record. (R. 12-24). The ALJ found that Ms. Perez had the following "severe impairments: diabetes mellitus, diabetic neuropathy, hypertension, degenerative changes of the cervical and lumbar spine, obesity, anemia, and depression." (R. 14). He further found these impairments, or a combination of these impairments, did not meet or equal a listed impairment. (R. 14). Specifically Ms. Perez did not meet Listing 9.08, diabetes mellitus, because the medical evidence did not demonstrate that any neuropathy associated with her diabetes had resulted in significant and persistent disorganization of motor function in two extremities resulting in sustained disturbances of gross and dexterous movements, or gait and station. Nor had she experienced acidosis or retinitis proliferans. *Id.* Under Listing 1.04, disorders of the spin, there was no objective evidence of nerve root compression, spinal arachnoiditis, or that Ms. Perez was unable to ambulate effectively. (R. 15). Her kidney disease did not meet Listing 6.02, impairment of renal function, as there was no evidence that she had

undergone chronic hemodialysis or kidney transplantation, or that she had a persistent elevation of serum creatinine. *Id.* The ALJ, noting there was no Listing criteria for obesity, indicated that pursuant to SSR 02-1p, he considered her obesity, and its effect on her other impairments, in making his determination, "even though no treating or examining medical source has specifically attributed additional or cumulative limitations to the claimant's obesity." *Id.*

Finally, the ALJ found her depression did not meet Listing 12.04. *Id.* Although she had satisfied paragraph A of the criteria as she had sought and received treatment for depression for some time, she failed to meet the criteria of paragraph B. *Id.* Specifically, Paragraph B requires the mental impairment result in at least two of the following: marked restrictions of activities of daily living ("AODL"); marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decomposition, each of extended duration. *Id.* Based primarily on her own testimony, the ALJ found Ms. Perez only had mild restrictions in terms of her AODL. *Id.* Based on treatment notes from her psychiatrist, and supported by the consultive examiner, the ALJ found she had mild difficulties in terms of social functioning and moderate difficulties with regards to concentration, persistence, or pace. (R. 15-16). Relying on her testimony, he also found that Ms. Perez had not had any episodes of decompensation of extended duration. (R. 15). Similarly, Ms. Perez's depression did not meet any of 12.04's "C" criteria, as there was no evidence of repeated episode of decompensation, and her statements and testimony indicated "sufficient adaptability to maintain a large degree of daily activites," and that she was "able to function adequately outside her home." *Id.*

The ALJ also pointed out a state agency pyshiological consultant, made a similar determination, finding only mild limitation in all three areas under "B" and that Ms. Perez's depression was not severe to meet the "C" criteria. *Id.* However, the ALJ noted that although he

gave "significant weight" to Agency examiners, due to their consistency to the medical record, he gave some deference to Ms. Perez's subjective allegations, finding her depression caused moderate limitation in concentration and is therefor a severe mental impairment. *Id.*

The ALJ's RFC assessment and credibility determination is equally expansive. The ALJ began by listing Ms. Perez's alleged symptoms and AODL as she herself testified to. (R. 17-18). He then found that although her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects were not credible, and proceeded to systematically discuss the medical record to support his findings. (R. 18-23). After his careful and thoughtful analysis of the medical record, he determined that based on a combination of Ms. Perez's objectively documented degenerative back pain, obesity, hypertension, anemia, diabetic nephropathy and the need to use a cane, she could perform work at the sedentary level. 20 C.F.R. § 404.1567(a) (R. 23). He also determined, that as result of her obesity and hypertension, she must avoid concentrated exposure to environmental irritants. *Id.* Finally, he determined that she was limited to understanding, remembering, and carrying out simple and detailed, but not complex, instructions due to her limitations in concentration, persistence, or pace caused by her depression. *Id.*

The ALJ then found that Ms. Perez's previous job as a patient services representative qualified as past relevant work. Relying on the testimony of the VE, the ALJ further found that Ms. Perez's RFC did not preclude her from performing this past relevant work, as generally performed in the national economy. *Id.* Consequently, he concluded Ms. Perez was not disabled. (R. 24).

# IV.
# DISCUSSION

## A.
## Standard of Review

The applicable standard of review is substantial evidence. 42 U.S.C. § 405(g). Substantial

evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th

Cir. 2009). In Social Security cases, the standard of review is deferential, and the court may not

make independent credibility determinations or reconsider facts and evidence. *Clifford v. Apfel*,

227 F.3d 863, 869 (7th Cir. 2000); *Connour v. Barnhart,* 42 Fed.Appx. 823, 827 (7th Cir. 2002).

Even if reasonable minds may differ as to whether the plaintiff is disabled, the court must affirm

the ALJ's decision if it is supported by substantial evidence. *Books v. Chater*, 91 F.3d. 972, 978

(7th Cir. 1996). However, conclusions of law are not entitled to such deference, and, if the ALJ

commits an error of law, the decision must be reversed. *Schmidt v. Astrue*, 496 F.3d 833,841 (7th

Cir. 2007).

In his decision, the ALJ must "minimally articulate" the reasons for his ultimate

conclusion by "building an accurate and logical bridge from [the] evidence to [the] conclusion."

*Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); Clifford, 227 F.3d at 872. This is a "lax"

standard. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ need not address every

piece of evidence, but he cannot subjectively limit his discussion of the evidence to only that

which supports his conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). All that is

required is that the ALJ "articulate at some minimum level his analysis of the evidence" so that

the court can assess the validity of his findings and provide a meaningful review. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988).

## B.
### Five-Step Sequential Analysis

The term "disability" is defined in Section 423(d)(1) of the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); *Stanley v. Astrue*, 410 Fed. Appx. 974, 976 (7th Cir. 2011); *Liskowitz*, 559 F.3d at 739-40.

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §¤§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof

through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Ms. Perez presents two primary criticisms of the ALJ's decision:  1) The ALJ made an erroneous RFC finding and 2) the ALJ made an erroneous credibility finding.

## 1.
### The ALJ's Hypothetical

Ms. Perez presents one argument that requires remand. Within her critique of the ALJ's RFC finding, she argues the ALJ failed to include *all* of her impairments and incorporate them into a hypothetical. (Pl.'s Mem., at 18). A hypothetical question posed to a VE must include all limitations supported by medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009). As the court explained in *O'Connor-Spinner v. Astrue*, "[o]ur cases generally have required the ALJ to orient the VE to the totality of a claimant's limitations" and, that same judicial precedent, "suggest[s] that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." 627 F.3d 614, 619-20 (7th Cir. 2010). However, despite Ms. Perez's contention otherwise, (Pl.'s Mem., at 18), "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible," *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (quoting *Schmidt,* 496 F.3d at 846), and the ALJ explicitly found many of her limitations to be not credible. That said, she takes specific issue with the ALJ's failure to ask the VE a hypothetical which included her moderate limitations in concentration, persistence, and pace.

Since the ALJ, having given her the benefit of the doubt, found Ms. Perez had such limitations, (R. 16), it is without question, that among the limitations the VE was required to

consider were her deficiencies of concentration, persistence and pace. *O'Connor-Spinner v. Astrue,* 627 F.3d at 619; *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir.2009); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir.2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir.2002). However, there are exceptions to this general rule.

There is no *per se* requirement that an ALJ use that specific terminology – "concentration, persistence, and pace." *O'Connor-Spinner,* 627 F.3d at 619. Such an omission is allowed when it is manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. *Id.* For example, *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002) let stand a hypothetical formulated in terms of "repetitive, low stress" work, a description which excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's limitations on concentration persistence and pace. *Id.* At 285, 288-289.  Alternatively, the underlying condition that causes limitations in concentration persistence or pace, *e.g.,* pain or depression, if mentioned in the hypothetical, can sometimes substitute. *See Simila v. Astrue,* 573 F.3d at 522.

Furthermore, even if an ALJ fails to properly inform a VE, a court may assume a VE was adequately familiar with a claimant's limitations in that area, if there is evidence they independently reviewed the medical record, or were present during testimony discussing those limitations. *Id; Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004).

The question then becomes, did the language the ALJ used in his hypothetical adequately inform the VE of Ms. Perez's limitations in concentration, persistence, and pace, and if not, was the VE already independently aware of those limitations. Neither Ms. Perez's nor the Commissioner's respective briefs address these exceptions.

With respect to the construction of the hypothetical, the ALJ asked three increasingly

restrictive hypotheticals. His first two hypotheticals included essentially identical language about Ms. Perez's mental RFC, but assumed two different levels of exertion, light and then sedentary. (R. 70). His last hypothetical, did not reference any specific limitations, but simply asked the VE to assume a person who could not engage in sustained work activity. (R. 71).

The ALJ never mentioned "concentration, persistence, or pace" in any of his hypotheticals.[4] Nor did he ask the VE to consider a person suffering from depression. Instead, he asked the VE to assume a person who is "limited to understanding, remembering, carrying out simple and detailed, but not complex instructions." (R. 70). Such language has been repeatedly rejected by the Seventh Circuit as insufficient to orient a VE to limitations in concentration. In *Stewart* and similarly in *Young,* 362 F.3d at 1004 (7th Cir.2004), the ALJ restricted the inquiry to simple, routine tasks that did not require constant interactions with coworkers or the general public. 561 F.3d at 684-85. In both instances, the court held those restrictions did not adequately account for the plaintiff's medical limitations, including an impairment in concentration. *Id.* Similarly, the court in *O'Connor-Spinner*, rejected the Commissioner's argument that restricting a hypothetical to unskilled work was sufficient to account for limitations in concentration, persistence, and pace. 627 F.3d 614; *see also, Craft v. Astrue,* 539 F.3d 668, 677-78 (7th Cir.2008) (limiting hypothetical to simple, unskilled work does not account for claimant's difficulty with memory, concentration, or mood swings).

In his decision, the ALJ did attempt to create a connection between Ms. Perez's limitations in concentration, persistence, and pace and the language of his hypothetical: "Due to limitations in concentration, persistence, and pace caused by her depression, the claimant [*sic*] limited to understanding, remembering, and carrying out simple and detailed, but not complex

---

[4] Arguably if Ms. Perez's counsel had asked the VE about problems with depression or concentration such questions would be sufficient. That is not the case here. (R. 71-72).

instructions." (R. 23). However, such a *post hoc* rationalization does not cure the ALJ's fundamental failure to include her limitations in concentration in his hypotheticals at the hearing.

The question then turns to whether the VE had independent knowledge of Ms. Perez's limitations. There is no evidence in the record to suggest that the VE reviewed the medical record. In fact her testimony suggests she only reviewed Ms. Perez's work history. (R. 67). The hearing transcript does indicate that she was present for the entire hearing (R. 32, 67) and Ms. Perez's issues with concentration were discussed at least twice (R. 47-48, 62-63). Arguably, the VE was, at the very least, aware of a potential limitation in concentration, persistence, and pace satisfying the exception. The problem, however, is in the construction of the ALJ's hypotheticals. When an ALJ "poses a series of increasingly restrictive hypotheticals to the VE … we infer that the VE's attention is focused on the hypotheticals and not on the record. *O'Connor-Spinner,* 627 F.3d at 619; *see Simila,* 573 F.3d at 521; *Young,* 362 F.3d at 1003. Here, the ALJ did not ask, as an example, to assume a hypothetical person with the same limitations as alleged by Ms. Perez, or to assume someone suffering from depression, which would have directed her to consider the testimony Ms. Perez has just given. Instead, his questions were restrictive and specific enough that they did not allow for the VE to consider limitations outside of what he asked. (*See* R. 70-71).[5]

---

[5] It's not surprising that the parties are unable to harmonize cases like *Stewart*, an EAJA case where the court stated that "[t]he Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position." 561 F.3d at 685, with cases like *Simila*, where the court stated that "[w]e have held that claimants who 'often experience[ ] deficiencies of concentration, persistence, or pace' are capable of performing semiskilled work, *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir.2003), and those who are 'mildly to moderately limited in these areas,'are able to perform 'simple and repetitive light work,' *Sims v. Barnhart,* 309 F.3d 424, 431 (7th Cir.2002)." 573 F.3d at 521-22. The Seventh Circuit has acknowledged that, given its "countervailing" decisions on the subject, "there is uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations." *Kusilek v. Barnhart*, 175 Fed.Appx.

(continued...)

The Commissioner's response arguing that Ms. Perez's problems concentrating were exaggerated is not persuasive. (Def.'s Resp., at 6-7). That may be, and the record certainly could support such a conclusion, but it does not negate the fact that the ALJ made a finding – even if he was giving her the benefit of the doubt – that Ms. Perez had moderate limitations in concentration persistence and pace, and was thus obligated to include it in a hypothetical to the VE. The ALJ's failure to do so, consequently, necessitates remand.

Ms. Perez insists "outright reversal is merited here because a remand would serve no purpose as the evidence shows a clear finding of disability when the ALJ's errors are corrected." (R. 23). Other than the ALJ's failure to ask the VE to include her moderate limitations in concentration, persistence, and pace in his hypothetical, he more than "minimally articulate[d] his reasons for crediting or rejecting evidence of disability." *Clifford,* 227 F.3d at 870. Ms. Perez's other allegations of error are not supported and are discussed below.

## 2.
## The ALJ's RFC Determination

### a.
### The ALJ's Rejection of Treating Physicians' Opinions

Citing SSR 96-2p and 20 C.F.R. § 404.1527(d)(2) Ms. Perez argues, correctly, that an ALJ "must give controlling weigh to a treating physician's opinion *if it is consistent with the other substantial evidence of the record*." (Pl.'s Mem., at 15) (emphasis added). However, the Seventh Circuit has repeatedly stressed that a treating physician's opinion "is 'not the final word on a claimant's disability,' " *Schmidt,* 496 F.3d at 842, and a claimant is not entitled to disability

---

[5](...continued)
68, 71, 2006 WL 925033, *3 (7th Cir. 2006).

41

benefits "simply because her physician states that she is 'disabled' or unable to work. More importantly, a treating physician's opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt,* 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005). It must follow, then, that once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *Hofslien v. Barnhart,* 439 F.3d 375, 376 (7th Cir.2006). Similarly, an ALJ may properly discount a treating physician's opinion if it is internally inconsistent. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2006). Here both Dr. Reed's mental RFC assessment and Dr. Dholaki's physical RFC assessment were inconsistent with objective medical evidence, and were inconsistent with their own more recent treatment/progress notes.

The ALJ rejected Dr. Reed's opinion, as set forth in his 2008 mental RFC assessment ("MRFC"), which indicated severe limitations resulting from Ms. Perez's mental impairment that were entirely inconsistent with other clinical findings contained within the mental health record. (R. 21). Furthermore, as the ALJ noted, "Dr. Reed endorses many signs symptoms, and resultant limitations which are not documented in his other reports, each of which reported much less significant findings with regards to the claimant's mental function. *Id.* (citations omitted). Incredulously, Ms. Perez's brief argues the ALJ "fails to point to anything that specifically undermines Dr. Reed's opinion," (Pl.'s Mem. at 14), when, in fact, the ALJ devotes an entire paragraph explaining why he was rejecting the MRFC. (R. 21, comparing R. 696-99 with R. 273-75, R. 673, and R. 950-977).

42

The ALJ also took particular issue with the inconsistencies between Dr. Reed's MRFC and the Agency disclosure he had completed seven days prior. (R. 20-21, *citing* R. 673 and comparing 696-99). The ALJ cited a disclosure from August, 2008, where Dr. Reed, indicated that although Ms. Perez suffered from major depression – severe, recurrent – she should nonetheless have the ability to perform work related activities such as understanding, carrying out, and remembering instructions, and responding appropriately to supervision, co-workers, and customary work pressures. (R. 20-21, citing, R. 673). Furthermore, despite Dr. Reed's clinical finding of depression with "[s]ignificant impairment in mood, energy, interest, hopelessness" he believed that Ms. Perez should have the ability to complete work-related activities such as understand, carry out and remember instructions, and respond appropriately to supervision, co-workers, and customary work pressures. (R. 20-21, citing R. 673). However, just days later he indicates she has "no useful ability" to do work-related activities on a day-to-day basis in a competitive work setting given her "severe impairment in Mood, Cognition, Affect and Sleep." (R. 697, 699).

The ALJ also took issue with Dr. Reed's MRFC finding of repeated episodes of decompensation that caused her to withdraw or experience exacerbation of her symptoms, (R. 699), having earlier found the record contained no evidence that Ms. Perez ever experienced an episode of decompensation and that– by her own testimony –she had not been hospitalized for her mental symptoms, or experienced an exacerbation of those mental symptoms. (R. 16, 21).

The ALJ also noted that Dr. Reed's MRFC is internally inconsistent. (R. 21). The ALJ found significant, and incongruent, Dr. Reed's opinion that Ms. Perez's impairments had not lasted, and were not expected to last, for at least twelve months. (R. 21, citing R. 698). Similarly, the ALJ pointed out, that despite checking "Extreme" for difficulties in maintaining social

functioning, and "Constant" for deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner – in work settings or elsewhere, Dr. Reed checked "None" for restrictions of activities of daily living (R. 21, citing R. 699).

Even more significant, Dr. Reed's MRFC was undermined by his own, more recent, treatment notes. Without a trace of irony, Ms. Perez's brief cites SSR 96-7p for the proposition that an ALJ must consider the longitudinal record. (Pl.'s Mem., at 12). As the ALJ himself notes, (R. 22), a survey of patient notes generated by Dr. Reed's practice from 2008 to 2009, consistently demonstrates that although her mood and affect fluctuated – frequently depressed or sad but sometimes normal – her attention and psychomotor function were consistently normal, her thought content – when commented on – was also normal, her thought process was logical and sequential, she denied suicidal ideations, and her insight and judgment were fair/good. (R. 953, 955, 957, 959, 961, 963, 965, 967, 969, 971, 972, 973, 974, 975, 976). Similarly, the ALJ, noting Ms. Perez's ability to concentrate was the area of functioning most affected by her depression, pointed out that Dr. Reed indicated, as recently as August of 2009, just 3 months before the hearing, that her concentration and sleeping patterns had improved, suggesting to the ALJ that her alleged mental impairments were not as limiting as she claimed. (R. 23).

In fact, despite Ms. Perez's assertion that Dr. Reed's assessment had become less optimistic during the years of treatment, (Pl.'s Mem at 12), the ALJ noted her most recent records were relatively positive. (R. 22). Starting with March 30, 2009, a chronological reading of "Patient Progress Notes" seems to indicate a trend of clinical improvement with respect to appetite, attention, and concentration (R. 959, 957, 955, 953). Also in 2009, while not dispositive – and there certainly were contemporaneous accounts that she was still saddened and stressed by family issues particularly with her daughter – the treatments notes are littered with notations of

subjective improvement, again suggesting a positive trend. (*See* 959, 955, 953, 971, 969, 967). More importantly, as the ALJ noted, "the clinical findings made during this treatment have not suggested that she has marked limitation in her ability to perform basic non-exertional work activities." (R. 22).

The numerous inconsistencies noted by the ALJ, between reports submitted by Dr. Reed and his own treatment notes, were sufficient for the ALJ to have rejected Dr. Reed's opinion with regard to the limiting effects of Ms. Perez's mental impairment as contained in the MRFC.

Ms. Perez makes a similar argument with respect to Dr. Dholakia, that the ALJ impermissibly discounted Dr. Dholakia's opinion contained in his 2009 physical RFC assessment ("PFRC"). (Pl.'s Mem., at 14). The limitations he assessed are extreme. He indicated that due to her symptoms, Ms. Perez could only walk half a block, sit for only 15 minutes at a time, and stand for only 10 minutes – in an eight-hour workday she could sit for less than two hours total or stand/walk for two hours total. (R. 704). She could only lift less than ten pound. (R. 705).

The ALJ explained that he gave "little weight" to this "fairly limiting" assessment of Ms. Perez's work-related abilities, in part because Dr. Dholakia did not indicate the clinical findings he was basing his opinion upon, and more importantly because the "objective treatment record generally does not support the opinions he expressed." (R. 21).

As with Dr. Reed, Dr. Dholakia's PRFC was also undermined by his own, more recent, treatment notes. For example, the ALJ noted that in a more recent treatment note by Dr. Dholakia, dated August 9, 2009, other than her longstanding diagnosis of diabetes, hypertension, depression, and cervical disc disease Ms. Perez's neurological, cardiovascular, psychiatric, and musculoskeletal conditions were well within normal limits. (R. 22, *citing* 713-15, 757). In that

same record Dr. Dholakia indicated "[n]o pain, weakness, or *functional disability...* [n]o numbness, tingling, dizziness or dyscoordination." (R. 715, emphasis added). He continued, "[c]rainial nerves … intact, reflexes symmetric bilaterally, sensory exam intact, no gross neural deficits… [n]ormal gait and balance, no focal weaknesses, no joint swelling, normal range of motion." *Id.* Similarly an examination of her eyes was completely unremarkable. *Id.* The ALJ also noted that a month prior, Dr. Dholakia indicated Ms. Perez's diabetes was "doing fairly good."Ó (R. 22, *quoting* R. 726).

In rejecting Dr. Dholakia's PRFC, the ALJ also found significant that physical therapy records demonstrated objective improvements. (R. 22, *citing* R. 837, 931-34). In fact, Dr. Dholakia himself noted in August 2009, her issues with her cervical spine were "better with physical therapy *no further treatment necessary.*" (R. 715) (emphasis added).

Finally, in addition to the inconsistencies between Dr. Dholakia's PRFC and his later clinical findings, the PRFC is completely at odds with the majority of other objective evidence. Throughout his RFC assessment, the ALJ noted, with citations to the medical record, frequent unremarkable physical examinations, asymptomatic findings, and subjective and clinical reports of improvement. (*See e.g.,* R. 19). Diagnostic testing and physical examinations showed little evidence of anything more than mild neurological or musculoskeletal deficits and repeatedly showed Ms. Perez retained full muscle strength and tone, had full range of motion in her joints, a normal gait, and engage in a range of postural activities. (R. 20, *citing* R. 547, 550, 568 *and,* R. 21-22, *citing* R. 541-42, 565, 715, 770, 779). Most notably, a nerve conduction study of her left leg was, "essentially normal," (R. 550) and showed no evidence of neuropathy or myopathy in that extremity. (R. 20, *citing* R. 550). Similarly her most recent MRI of her cervical spine showed a central disk bulge with some stenosis, but no spinal cord lesions were demonstrated.

(R. 21, *citing* R. 779), and her physical therapist indicated she was making good progress regarding her cervical spine. (R. 21, *citing* R. 928). An MRI of her lumbar spine, showed some degenerative changes – "Òvery mild space narrowing," (R. 770) – but no other notable findings. (R. 21, *citing* R. 770).

In turn, these numerous unremarkable medical observations and diagnostic findings, which Ms. Perez characterizes as "cherry-picking" the record, are completely consistent with the findings made by Dr. Patil during his exam of Ms. Perez. As noted by the ALJ:

> "Dr. Patil observed that the claimant had minor limitations in her lumbar spine range of motion, while there was no tenderness or spasm and her neck and shoulders were normal. The claimant was neurologically intact, as her reflexes were brisk and equal throughout, her cerebellar function tests were normal, superficial and deep sensations were unimpaired, motor strength was 5/5 in all upper and lower extremities, and all cranial nerve functions were preserved. A full range of motion in all of the joints was noted, and the claimant was able to perform all fine and gross manipulative movements wither he hands and fingers. No abnormalities were observed in relation to her gait, ability to squat and arise, or to heel and toe walk."

(R. 19-20, citations omitted). Moreover, an ALJ may discount a treating physician's opinion it is inconsistent with a consulting physicians opinion. *Ketelboeter*, 550 F.3d at 625.

## b.
## The Significance of Medical Diagnoses

Ms. Perez also accuses the ALJ of ignoring or diminishing her medical diagnoses. The argument being: had the ALJ but considered "X", he would have had no choice but to find her disabled. However, she purports unfounded significance on diagnoses as proof of her disability. There is no denying Ms. Perez has had a lot to contend with. However, the issue is not whether she has a plethora of ailments. Rather, the dispositive question is what effect those ailments, either by themselves, or in combination, have on her ability to work. Her brief however,

frequently does no more than argue that she is disabled because she has a laundry list of inflictions, without any meaningful explanation as to *how* those ailments preclude her from competitive work. (*See e.g.,* Pl.'s Mem., at 11, 17, 19). A diagnoses, or symptom for that matter, does not automatically translate to a limitation or impairment and simply listing them proves nothing. Furthermore, the ALJ needed "only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible." *Outlaw v. Astrue,* 412 F. App'x 894, 898 (7th Cir. 2011) (*citing Simila v. Astrue,* 573 F.3d 503, 520–21 (7th Cir.2009); SSR 96–8p).

Furthermore, in listing her diagnoses, Ms. Perez lists diagnoses of conditions that a review of the medical record suggests were resolved. For example, Ms. Perez brings up several times a prior diagnosis of degenerative joint disease in her knees. (Pl.'s Mem., at 17, 19; Pl.'s Reply, at 10). This "diagnosis" was from 2006, when the treating physician related to her the *possibility* she might have mild degenerative joint disease in her knees. (R. 590). What Ms. Perez's brief neglects to mention, is the physician offered her a Depo-Medrol injection which she opted for in *only* her left knee, *id.*, which resulted in a decrease in left knee pain from a 9/10 to a 0/10. (R. 587). Subsequently, there are no other complaints of knee pain that Ms. Perez's briefs cite to.[6]

Similarly, Ms. Perez is adamant in her reply brief, that the record reflects *"significant"* limitations to her arms and hands and in support cites to a string of diagnoses and treatments, previously listed in her original brief: frozen left shoulder, physical therapy rotator cuff tendonopathy, right ring finger release surgery and a subsequent metacarpophalangeal injection

---

[6] Despite her claims of disability resulting from her left leg giving out at the knee, it's always been her contention that the condition is neurological, possibly caused by a herniated disc, (R. 44), and not the result of a biomechanical deficiency at the joint itself, nor is there anything in the medical record to suggest otherwise.

at the joint. [7]   (Pl.'s Replay at 11). She continues, arguing the ALJ should have considered these "limitations" because they prove she does not have good bilateral manual dexterity thereby precluding her from unskilled sedentary employment." *Id.* However, these conditions were also successfully treated. (*See*, R. 931, 937-938, 732, 748).

Ms. Perez's later argument, that the ALJ's Step 4 finding is erroneous, is merely a reiteration of her previous allegations of a deficient RFC assessment: had the ALJ just considered the evidence believed by Ms. Perez to support her alleged limitations, (*see* Pl.'s Mem., at 23 for another long list of diagnoses), he would have found her unable to perform even sedentary work.[8] As previously discussed, such an undeveloped argument is not persuasive.

### c.
### The ALJ's Development of the Record

Ms. Perez relying on 20 C.F.R. § 404.1517, argues the ALJ should have called on the services of a psychological consultive examination if he determined that Dr. Reed could not provide sufficient medical evidence about her mental impairments. She continues that because no Agency psychological assessment was used, if there were any questions about the veracity of Dr. Reed's statements, the ALJ had an affirmative duty to re-contact Dr. Reed pursuant to 96-5p.

While it is generally true that the ALJ's has an obligation to develop a full and fair record, *see Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir.2009); *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir.2004), an ALJ is "entitled to assume" that an applicant represented by an

---

[7] Dr. Dhokalia's discounted 2009 physical RFC assessment, which Ms. Perez insists is accurate, specifically notes that she has no significant limitations in reaching, handling, or fingering.

[8] Within this repackaged argument, is in an allegation the ALJ failed to identify any transferable skills, which he was under no obligation to do so, having found that she was capable of performing her past relevant work as is generally performed in the national economy. SSR 82-41, Policy Statement (1).

attorney is making his "strongest case for benefits*." Nicholson v. Astrue*, 341 Fed.Appx. 248, 254, (7th Cir. 2009) (*citing Glenn v. Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir.1987); *Wilkins v. Barnhart,* 69 Fed.Appx. 775, 781, 7th Cir. 2003). *See Bowen v. Eckert,* 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)("[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so"); *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir.2004). Additionally, "the ALJ must exercise some discretion in deciding when and how he should order additional evidence." *Griffin v. Barnhart,* 198 Fed.Appx. 561, 564 (7th Cir.2006). The degree of the ALJ's responsibility to take the initiative is influenced, if not entirely dictated, by the presence or absence of counsel for the claimant. *Nicholson,* 341 Fed.Appx. at 254. As Ms. Perez was represented by counsel, the ALJ was under no obligation to either request a psychological consultive exam or re-contact Dr. Reed.

Furthermore, the ALJ believed he had sufficient evidence to determine Ms. Perez's RFC. He based his determination in part on Dr. Patil's consultive examinations, which included a mental status examination.[9] (R. 20, *citing R. 502).* He also relied on not one, but two, Agency psychological consultants. He explained, "I give significant weight to the findings of both State agency examiners, due to their overall consistency with the record when viewed in it's entirety." (R. 16)[10]. In fact, it was the ALJ himself, who, despite his negative credibility determination, gave Ms. Perez's subjective allegations some deference and found that her depression caused a moderate limitation in her ability to concentrate, and was therefore a severe impairment. (R. 16).

---

[9] Ms. Perez takes issue, without explanation or citation to authority, with the fact that CE was performed by a medical doctor instead of "Òpsychiatric consultant." (Pl.'s Mem., at 13).

[10] Nowhere in her initial brief does she address the two consultative Psychiatric Review Techniques.

Finally, as discussed above, the ALJ *did* rely on opinions and records provided by Dr. Reed in makings his decision.

### d.
### The Claimant's GAF Scores

Ms. Perez, pointing to GAF scores as support for Dr. Reed's negative assessment, argues the ALJ should have addressed them. First, there are only two GAF scores in the record. Dr. Reed's 2007 initial assessment assessed a score of 45-50 (R. 267). His 2008 MRFC assessed a score of 50-55, showing, if anything, a slight improvement. (R. 696). Considering the ALJ was justified in discounting the 2008 MFRC, the significance of a single GAF score from the start of Ms. Perez's treatment in 2007 is debatable.

Second, a claimant cannot use a GAF score to establish disability because "GAF scores… are measures of both severity of symptoms and functional level," and "the final GAF rating always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see* 65 Fed. Reg. 50746, 50764-65 (2000).

### 3.
### The ALJ's Credibility Finding

Ms. Perez's second major criticism is that the ALJ made an improper credibility finding. An ALJ must support his credibility finding with articulate reasoning based on evidence in the record. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003). In examining the credibility of the claimant, the ALJ must take a number of factors into account, including the objective medical evidence,

descriptions of the symptoms, treatments used to assuage those symptoms, and the daily activities of the claimant. *Id; Simila*, 573 F.3d at 517; 20 C.F.R. § 404.1529(c) (2)-(4).

But an ALJ need not discuss every piece of evidence in the record. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009). Nor does the "logical bridge" requirement specify how much the ALJ must say – the very nature of the enterprise precludes quantification, and the staggering workload of ALJs dictates that their opinions are, of necessity, often succinct.[11] Rather, it merely recognizes the obligation of the ALJ "to rationally articulate the grounds for... decision." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

In fact, an ALJ's credibility assessment and ultimate determination need not be perfect. *Outlaw v. Astrue*, 412 Fed. Appx. 894, 899, 2011 WL 891803, at *5 (7th Cir.2011); *Simila*, 573 F.3d. at 517; *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir.2008), 516 F.3d at 546. So long as they are not "patently wrong," *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir.2010), and the latter finds "some support" in the record, *Berger*, 516 F.3d at 546, an ALJ's credibility and eligibility determinations will not be disturbed, regardless of how a reviewing court might have viewed the matter were it *res integra*. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue*, 390 Fed.Appx. 581, 587 (7th Cir. 2010).

Ms. Perez first argues that the ALJ "played doctor" when he found that her leg limitation was unsupported. (Pl.'s Mem., at 18). She continues that such a limitation was in fact supported, because diabetes in general can cause peripheral neuropathy. While she is entirely correct that diabetes can cause peripheral neuropathy, which can contribute to numbness and weakness in an individual's legs, the fact remains, that objective medical evidence, such as her EMG, and several physical examinations including a CE, as discussed *supra,* did not support her claims of

---

[11] http://www.ssa.gov/policy/docs/statcomps/supplement/2011/2f8-2f11.html.

limitation of numbness and weakness in her legs. *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir.2008) (discrepancies between objective evidence and self-reports may suggest symptom exaggeration).

She takes particular issue with his characterization of her EMG test and C-spine MRI, reiterating her accusation of "play[ing] amateur doctor", *id.,* when, it could not be more clear from the decision that his assessment of that evidence was based not on his own opinion, but that of a treating physician Dr. Mayer, who "Òreiterated that the claimant had a *normal* EMG and cervical spine MRI scan." (R. 20 *citing,* R. 568) (emphasis added). Similarly her complaint that he dismissed her MRI confirming minor stenosis off-hand is unfounded as he explicitly considered it in conjunction with her physical therapist's letter that she was making "good progress with regards to her cervical spine." (R. 21).

Furthermore, the ALJ generally did not question most of her symptoms; in fact he gave her the benefit of the doubt several times. He indicated he gave some deference to her subjective allegations in finding that her depression causes a moderate limitation in concentration despite what two separate consultative psychologists found. (R. 16). Similarly, despite the fact that there is virtually no objective evidence indicating Ms. Perez had any difficulty ambulating, the ALJ acknowledged one solitary medical report that recommended she use a cane and limited her to sedentary work. (R. 20). What the ALJ did question was the intensity, persistence, and limiting effects of Ms. Perez's symptoms:

> "The evidence summarized above indicates that while diagnostic testing has revealed impairments that limit the claimant's work-related abilities, the clinical findings and observations made by physicians nonetheless confirm that her limitations are not as great as she alleges. Very few musculoskeletal or neurological deficits have been documented, and the records reflect that physical therapy has been fairly effective in improving the claimant's physical functioning. An EMG revealed no evidence of neuropathy or myopathy in her left leg, despite

the claimant's numerous complaints of severe pain in that extremity, and despite her claims of left lower extremity limitations, at worst she has had only very mild limitations in her left leg motor abilities, and minor deficits in sensation. No abnormalities were observed in relation to her gait, ability to squat and arise, or to heel and toe walk, despite her statements that she is reliant upon a cane while walking. Additionally, no deficiencies have been reported regarding the claimant's ability to perform fine and gross manipulations. Therefore, despite notable diagnostic findings, examinations have revealed the claimant nonetheless retains a wide range of functional abilities."

(R. 22)

Ms. Perez next asserts the ALJ impermissibly held her receipt of unemployment benefits against her. While the ALJ did note she received unemployment benefits, (R. 17), there is no indication what weight, if any, he gave this fact. And while Ms. Perez is right, that receiving unemployment is not by itself significant and more importantly does not preclude a finding of disability, a person who applies for unemployment must represent to the State that she is willing and able to work and that fact may cast some light on the credibility of a claimant's allegation of disability. *Schmidt,* 395 F.3d at 746. However, the ALJ found the fact she did not leave her job due to her impairment-related limitations, but because she was fired[12] and continued to look for work as a receptionist, "severely diminishes the credibility of her claim that since March 2007, her impairments have precluded her performing all basic work activities." (R. 22). The ALJ also noted her confirmed level of daily activities – making her husband's lunch, crocheting, reading, using the computer, cooking meals twice a week, vacuuming her entire house every other day, and grocery shopping once every two months (R. 15, 18), – "further suggests that she would be able to perform work at the sedentary level." (R. 22)."

---

[12]  She argues, without any support, that her termination –because she did not "get along" with her team leader, (R. 36) – was the result of her mental illness. (Pl.'s Mem., at 21).

Of course Ms. Perez takes issue with these findings, and if the ALJ's credibility findings were based solely on these observations alone, then Ms. Perez might have a point. However these facts were merely part of the ALJ's well-reasoned determination, considered in combination with the fact that the objective medical evidence did not support the severity of Ms. Perez's limitations as alleged.

Finally, Ms. Perez, referencing SSR 96-7p, argues, in a single sentence, that the ALJ failed to consider her medication's side effects when making his credibility finding. (Pl.'s Mem., at 21). She asserts, without any specificity, that *all* of her medications have the potential to cause dizziness, insomnia, or fatigue *Id.;* (Pl.'s Mem, at 6, n.7). She suggests that the ALJ was obligated to consider theses possible side effects. In her reply brief, for the first time, she argues her medication and the resulting dizziness, fatigue, and insomnia, render her "off task". (Pl.'s Reply, at 9). However, she testified that her psychiatric medications did not cause her any negative side effects. (R. 47; *see also* R. 698). The only mention of a side effect in the record that Ms. Perez cites to is with respect to Vicodin, (Pl.'s Mem., at 21; *citing* R. 61), which is not one of the listed medications her brief claims she is taking (Pl.'s Mem, at 6, n.7). And at the hearing, she testified that she generally takes Vicodin only at night, and that it didn't cause any negative side effects. (R. 45). The ALJ was certainly not required to contemplate the possibility of side effects when Ms. Perez herself alternatively denied any.

**CONCLUSION**

For the aforementioned reasons, the plaintiff's motion for remand is GRANTED, her motion for summary judgment DENIED, and the Commissioner's motion for summary judgment is DENIED.

DATE: 7/3/12                    ENTERED: _____

UNITED STATES MAGISTRATE JUDGE